UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CENTER FOR BIO-ETHICAL
  REFORM, INC. et al.,

                        Plaintiffs,

                                  **REPORT AND**
                                  **RECOMMENDATION**
           v.                            13-CV-581A

DENNIS R. BLACK et al.,

                        Defendants.

---

**I.    INTRODUCTION**

The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b). Pending before the Court is a motion (Dkt. No. 11) by defendants Dennis R. Black ("Black"), Barbara J. Ricotta ("Ricotta"), Thomas Tiberi ("Tiberi"), and Gerald W. Schoenle, Jr. ("Schoenle")[1] to dismiss plaintiffs' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). Defendants argue that they permitted plaintiffs' public exhibit to occur as scheduled, that any disruption of plaintiffs' speech came from counter-protesters who attended the exhibit, and that plaintiffs have not alleged any collusion between defendants and the counter-protesters. Related to this point, defendants assert that plaintiffs have not alleged the personal involvement of any of them in any deprivation of

---

[1] Black and Ricotta are sued only in their official capacities as high-ranking executives at the State University of New York at Buffalo ("UB"); Tiberi and Schoenle are sued both individually and in their official capacities.

free-speech rights.  Defendants argue further that plaintiffs have not sufficiently alleged different treatment between themselves and the counter-protesters to sustain an equal-protection claim.  Finally, defendants assert that any violations of UB policies and regulations cannot amount to a claim under Section 1983.[2]

Plaintiffs oppose defendants' motion in several ways.  Plaintiffs argue that defendants' decision to stand by and allow counter-protesters to block their exhibit amounted to interference in their autonomy to choose the content of their message, thus violating their First Amendment rights.  Plaintiffs argue further that defendants' acquiescence in the obstruction of their exhibit constituted an impermissible "heckler's veto" because the content of their exhibit prompted that conduct.  Plaintiffs defend their equal-protection claim by arguing that defendants played favorites by allowing only one group of protesters to express its message without obstruction.  Finally, while plaintiffs concede that defendants Black and Ricotta are sued only in their official capacities and only for injunctive purposes, they assert that they have made sufficient allegations about the direct personal involvement of defendants Tiberi and Schoenle.

The Court held oral argument on September 18, 2013.  For the reasons below, the Court respectfully recommends denying defendants' motion.

---

[2] Defendants also make an argument about how plaintiffs' allegations cannot sustain a claim under the "state-created danger" doctrine.  The Court will not consider this argument since plaintiffs do not assert it in the complaint.

## II. BACKGROUND

This case concerns allegations that defendants violated plaintiffs' free-speech and equal-protection rights by allowing counter-protesters to obstruct a poster exhibit that they displayed earlier this year at UB's North Campus.[3] The poster exhibit in question is an exhibit that plaintiffs call the Genocide Awareness Project ("GAP"), a "traveling photo-mural exhibit that compares the contemporary genocide of abortion to historically recognized forms of genocide, such as the Holocaust." (Dkt. No. 1 at 5 ¶ 18.) In December 2012, plaintiffs used UB's online reservation system to request an area to display the GAP on April 15 and 16, 2013. Plaintiffs requested an area outside the main entrance to the Student Union building on the North Campus. (*See generally* Dkt. No. 1-1.) The record is not clear as to how large the reserved space at this particular location usually is and whether that size changed for plaintiffs.

Once plaintiffs submitted the reservation request, the matter appears to have remained quiet until late March and early April 2013. Around that time, plaintiffs met with defendants, at defendants' request, regarding "concerns" about the graphic nature of the pictures in the GAP. Through this meeting and subsequent communications, defendants attempted either to move the GAP to a more remote location on campus, or to reduce its size, because they did not want

---

[3] For brevity and in recognition of the factual standard under FRCP 12(b)(6), the Court will avoid repeated use of the word "alleged" when summarizing plaintiffs' factual allegations.

people to be forced to see it.  Plaintiffs resisted defendants' efforts to the point of threatening litigation.  Defendants ultimately allowed plaintiffs to display the GAP, without modification, in the area outside the Student Union that plaintiffs preferred.  While plaintiffs have suggested in their papers and at oral argument that events preceding April 15 and 16, 2013 provide background and evidence of intent to interfere with their free-speech rights, they do not appear to be alleging that these events in themselves caused any actionable injuries.

    The events that did give rise to plaintiffs' claimed injuries stem from the display of the GAP on April 15 and 16, 2013.  On April 15, plaintiffs set up the GAP in their reserved area; the record does not note an approximate time or whether the barricades depicted in the photographs attached to the complaint are standard practice for such exhibits.  For some period of time on April 15, the GAP proceeded relatively uneventfully.  (*See generally* Dkt. No. 1-1.)  Later in the day, approximately 20–30 counter-protesters arrived at the GAP to express disapproval of its content and its presence on campus.  The counter-protesters initially stayed approximately 20 feet away from the GAP, which allowed them to express their message without interfering with the message that plaintiffs were expressing through the GAP.  (*See id.* at 3.)  After an unspecified period of time, however, the counter-protesters moved right up to the barricades surrounding the GAP and used signs, bed sheets, and umbrellas to obscure the GAP from view.  (*See generally* Dkt. Nos. 1-2 and 1-3.)  The parties have not submitted any

4

information suggesting that any counter-protesters reserved any space for their activities. Plaintiffs complained to campus police but did not pursue the issue further that day, given the late hour and given that plaintiffs were disassembling the GAP for the evening. The next day, however, when plaintiffs set up the GAP again, the counter-protesters reappeared and obstructed any view of the GAP using signs, bed sheets, and umbrellas. To summarize numerous paragraphs in the complaint, plaintiffs had repeated and sometimes heated communications with campus police to complain that the counter-protesters were interfering with their speech and that the police were doing nothing about it. The police, and defendants Tiberi and Schoenle in particular, repeatedly declined to take any action against the counter-protesters. "In fact, a university police officer told Plaintiff Ramsey that the officers were under orders not to stop the protestors' disruptive conduct." (Dkt. No. 1 at 10 ¶ 41.) As a result, the GAP was mostly or fully obstructed for most of the day on April 16.

The events of April 15 and 16, 2013 led to the filing of the complaint on June 4, 2013. The complaint contains two claims brought under 42 U.S.C. § 1983. In the first claim, plaintiffs accused defendants of violating their First Amendment rights by refusing to enforce their own policies and regulations based on the content of the GAP. Plaintiffs accused defendants further of acquiescing in a "heckler's veto" by allowing the counter-protesters to obstruct the GAP for much, if not most, of the entire time that plaintiffs reserved. In the second claim,

5

plaintiffs accused defendants of violating the Equal Protection Clause of the Fourteenth Amendment by allowing the counter-protesters' speech but not their own even though both groups were similarly situated. Plaintiffs demanded only nominal damages against the defendants sued in their individual capacities. Plaintiffs also demanded a permanent injunction against defendants prohibiting them from allowing obstruction of plaintiffs' speech. Plaintiffs included a demand for costs and fees as well. The demand for injunctive relief appears to be plaintiffs' highest priority, since they have stated in Paragraph 55 of the complaint that they want to bring the GAP back to campus sometime during the 2013-14 academic year.

  Defendants filed the pending motion to dismiss on August 15, 2013. According to defendants, plaintiffs' free-speech claim fails for two reasons. Prior to April 15, 2013, plaintiffs received every accommodation that they requested, regardless of any allegations about a reluctance to accommodate them. During the two days of the GAP exhibit, anything that happened to obstruct the view of the GAP came from the counter-protesters and not defendants. Related to this point, defendants note that plaintiffs have not alleged the kind of collusion between them and the counter-protesters that might trigger liability under either an accomplice theory or the "state-created danger" doctrine. As for the equal-protection claim, defendants assert that plaintiffs were able to carry out the GAP exhibit as scheduled and that the conduct of the counter-protesters does not arise

6

to differential treatment of similarly situated groups. In fact, according to defendants, plaintiffs' claim essentially would require defendants to effect the inverse of what plaintiffs think happened to them: In the future, defendants would have to treat the counter-protesters differently and suppress their speech. In rounding out their arguments, defendants also assert that plaintiffs have failed to allege personal involvement by any defendant; that a violation of UB policies or regulations does not rise to a Section 1983 claim; and that the concept of a "heckler's veto" does not apply here. Defendants believe that this case does not present a "heckler's veto" scenario because that scenario requires government officials to shut down speech out of fear of the reaction to it; in contrast, defendants here simply allowed plaintiffs and the counter-protesters to confront each other without interference. On a related point, defendants argue that, under the facts that plaintiffs have pled, they had no duty to ensure that the GAP exhibit had any sort of successful outcome, however that might be defined.

Plaintiffs oppose defendants' motion in several ways. Plaintiffs assert that the GAP exhibit constituted speech protected by the First Amendment and that the display area near the Student Union constitutes a limited public forum. Defendants have not disputed those assertions. Plaintiffs assert further that defendants violated their First Amendment rights because defendants had an affirmative duty to allow their speech to occur without the kind of obstruction that effectively would silence them. By allowing the counter-protesters to obstruct the

GAP exhibit mostly or completely, defendants disrupted plaintiffs' speech and imposed a "heckler's veto" by proxy. According to plaintiffs, defendants' decisions regarding the counter-protesters also constitute an equal-protection violation in that the counter-protesters expressed all of their speech while plaintiffs expressed little of theirs, and for no reason other than the content of plaintiffs' speech. As for defendants' other arguments, plaintiffs emphasize that defendants Tiberi and Schoenle were actively involved in all of the events concerning the GAP exhibit, while defendants Black and Ricotta are the officials who, in their official capacities, would be subject to prospective injunctive relief under the *Ex parte Young* doctrine.

At oral argument, the Court asked counsel for plaintiffs whether individual plaintiffs the Center for Bio-Ethical Reform, Inc., Gregg Cunningham, and Darius Hardwick had standing to join the other plaintiffs in the case, given that they are neither UB students nor UB organizations. Counsel for plaintiffs answered in the affirmative because UB policies and regulations permit collaboration and co-sponsorship of events by UB and non-UB entities. Defendants did not dispute that point, and after a brief review of the issue, the Court agrees and will not address it further.

### III. DISCUSSION

#### A. *Motions to Dismiss Generally*

The Court generally will proceed through its analysis under the familiar evidentiary standard of FRCP 12(b)(6), "construing the complaint liberally,

accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted). That said, however, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citations omitted).

   **B.**   ***Elements of a Section 1983 Claim***

To assess the legal and factual plausibility of plaintiffs' First Amendment and equal-protection claims, the Court will proceed to examine the elements of a Section 1983 claim. "To state a claim under Section 1983, a plaintiff must show: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; [and] (4) damages." *Rahman v. Fisher*, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) (citing *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir.

9

2008)). Concomitant with the second element is "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). Here, and for purposes of the pending motion, three of the four elements of a Section 1983 claim are not in dispute. Defendants do not argue that any alleged actions that might subject them to liability were not taken under color of law. Defendants also do not deny that any deprivation of constitutional rights, if true, would be a substantial factor in bringing about an injury. If a deprivation of a constitutional right occurred then plaintiffs would be entitled to damages, if only nominal damages. *See Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999) ("While the main purpose of a § 1983 damages award is to compensate individuals for injuries caused by the deprivation of constitutional rights, a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury."). Plaintiffs' ability to survive dismissal, then, reduces to whether they have set forth plausibly that the defendants sued in their individual capacities were personally involved in a deprivation of plaintiffs' First Amendment and equal-protection rights.

1. *Deprivation of Constitutional Rights*

    a. First Amendment

"Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "The protections of the First Amendment are made applicable to the states through the Fourteenth Amendment." *Caractor v. City of N.Y. Dep't of Homeless Servs.*, No. 11 Civ. 2990(DLC), 2013 WL 2922436, at *5 (S.D.N.Y. Jun. 14, 2013) (citing *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940)). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (citations omitted). Assessing possible First Amendment violations occurs in three steps. First, courts determine whether the conduct in question constitutes speech protected by the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, "we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* "Finally, we must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

Here, two out of the three criteria set forth in *Cornelius* are not in dispute. Defendants do not contest that the GAP exhibit receives full First Amendment protection. *See also, e.g., Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cty*

*Sheriff Dep't*, 533 F.3d 780, 786–87 (9th Cir. 2008) (treating a poster display in a traditional public forum as fully protected speech); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821–22 (6th Cir. 2007) ("The First Amendment generally protects Plaintiffs' right to display signs communicating their views on abortion, and the fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection.") (internal quotation marks and citations omitted); *Christ's Bride Ministries, Inc. v. Se. Penn. Transp. Auth.*, 148 F.3d 242, 247 (3d Cir. 1998) (finding that posters hanging in the designated public forum of a subway station's advertising space "come within the ambit of speech fully protected by the First Amendment"). Defendants also do not contest that the area near the Student Union where the GAP exhibit occurred constitutes a limited public forum. *See Hershey v. Goldstein*, ___ F. Supp. 2d ___, 2013 WL 1431422, at *12 (S.D.N.Y. Apr. 9, 2013) ("The Supreme Court's decision in *Widmar* [*v. Vincent*, 454 U.S. 263 (1981)] found the state university meeting facilities in question to be a limited public forum.") (citations omitted); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 226 F. Supp. 2d 401, 418 n.12 (S.D.N.Y. 2002) ("Most courts have interpreted the Court [in *Widmar*] as having treated the University's forum as a limited public forum.") (citations omitted). The Student Union's status as a limited public forum sets up the standard of review for any alleged exclusion of protected speech that matches the kinds of speech for

which the forum was opened.[4]  "The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place.  Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983) (citations omitted).  "For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.  The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45 (citations omitted).

Ultimately, whether plaintiffs plausibly have pled a First Amendment violation hinges on whether their claim of condoned obstruction of the GAP exhibit is cognizable as an "exclusion from the relevant forum."  Three principles in First Amendment jurisprudence provide guidance.  The record is unclear as to how large the reserved area was and whether the counter-protesters encroached

---

[4] Plaintiffs have pled, and the parties have not challenged, that UB has opened the area near the Student Union for expressive activity like the GAP exhibit.  The Court thus need not consider the rule that "[r]estrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral." *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004) (citation omitted).

on it in any way.  To the extent that any encroachment occurred or that defendants pressured plaintiffs in any way to incorporate the counter-protesters into their speech, plaintiffs could claim that defendants dictated to them what their own speech should be.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572–73 (1995) ("Although the state courts spoke of the parade as a place of public accommodation, once the expressive character of both the parade and the marching GLIB contingent is understood, it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech itself to be the public accommodation.  Under this approach any contingent of protected individuals with a message would have the right to participate in petitioners' speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own.  But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.").  To the extent that plaintiffs were simply unhappy that a rival message appeared at their exhibit to counter their own, they were not entitled to an exhibit purged of dissent.  *Cf. Parks v. City of Columbus*, 395 F.3d 643, 653–54 (6th Cir. 2005) ("During the Arts Festival, Parks was acting in a peaceful manner and the only difference between him and the other patrons was that he wore a sign communicating a religious message and distributed religious leaflets.

When Officer Farr commanded Parks to move behind the barricaded area, he told Parks that the event sponsor did not want Parks there. The City offered no explanation as to why the sponsor wanted him removed."). Finally, to the extent that the counter-protesters obstructed the GAP exhibit so much that plaintiffs' speech barely came out, if at all, defendants were not allowed essentially to delegate the act of content-based restrictions to the counter-protesters and then hide behind a literal granting of space to the exhibit. *Cf. Startzell v. City of Philadelphia*, 533 F.3d 183, 198–99 (3d Cir. 2008) ("The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.").

  The record indicates that, at least for purposes of the pending motion, plaintiffs' situation resembles the situation in *Startzell*. In a narrow, literal sense, defendants are correct that plaintiffs received the exact reservation area that they requested and for the full amount of time that they requested. Defendants are

15

correct also in that the GAP exhibit was present in the reserved area in the form that plaintiffs desired, without any alterations imposed on it.  Plaintiffs, however, have pled that defendants knowingly allowed counter-protesters to approach the GAP exhibit as closely as the barricades would permit and to envelop the GAP exhibit with signs, blankets, umbrellas, and their own bodies.  The photographs attached to the complaint seem to indicate that the GAP exhibit was invisible from at least some angles and distances.  Plaintiffs have pled that they had communications with defendants that indicated that defendants were content to let the counter-protesters do what they could not do directly, because they did not like the content of the GAP exhibit.  Plaintiffs thus have pled that what defendants did or allowed equated to a denial of the use of the reserved area, since their message was obstructed as much as if defendants had forbidden the GAP exhibit outright.  Whether plaintiffs can prove their claims at trial is another matter entirely, and the discovery process will have to resolve numerous questions about the size of the reserved area, the exact nature of the counter-protesters' conduct, and what communications might have occurred among defendants and between defendants and the counter-protesters.  For now, though, plaintiffs have made a claim of indirect, content-based speech restriction that is legally cognizable and

have pled facts establishing that such a restriction plausibly could have happened. That suffices to defeat defendants' motion with respect to the First Amendment claim.[5]

                b.       Equal Protection

Discussion of plaintiffs' equal-protection claim need not take long, because the Supreme Court has "fused" First Amendment and equal-protection analysis together when a government entity treats similarly situated groups differently based on the content of their speech. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 n.4 (1992) (citations omitted); *Carey v. Brown*, 447 U.S. 455, 461–62 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.") (citations omitted); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("The central problem with Chicago's ordinance is that it describes

---

[5] While the Court doubts that defendants' conduct, as pled, constituted a "heckler's veto," the above analysis renders further examination of the question unnecessary. "A heckler's veto is an impermissible content-based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience." *Startzell*, 533 F.3d at 200 (citations omitted). Based on the current state of the record, the Court cannot rule out that defendants took certain actions out of fear of what might happen if the GAP exhibit remained on full display, but "the more germane question is whether [defendants'] actions were based on the content of the speech." *Id.* (citation omitted).

17

permissible picketing in terms of its subject matter. Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited. The operative distinction is the message on a picket sign. But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.") (citations omitted). Here, plaintiffs have pled a scenario in which two groups confronted each other to express speech concerning the same subject matter. Both groups had speakers and signs that conveyed the speech. No later than the first day of the GAP exhibit, defendants knew that this confrontation was occurring and would continue on the second day. By the end of the GAP exhibit, though, one group successfully expressed its speech to the detriment of the other group's speech, consistent with defendants' reluctance all along to let the GAP exhibit happen. The only discernible difference between plaintiffs and the counter-protesters was that the counter-protesters did not reserve any space or otherwise request permission for a sustained exhibit. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.") (citation omitted). That distinction, however, is not big enough to make the two groups different or to alter the analysis of plaintiffs' contention that defendants played favorites based on speech content. If anything, the lack of a reservation or permit

18

by the counter-protesters supports plaintiffs' contention that defendants delegated to the counter-protesters the task of making a disapproved exhibit go away. As with the First Amendment claim, plaintiffs will have to resolve a number of questions during discovery to substantiate their claim for trial. For now, though, plaintiffs have set forth a sufficiently plausible claim to defeat defendants' motion with respect to the issue of equal protection.

### 2. *Personal Involvement*

Defendants' argument about personal involvement also will not require much discussion given the allegations in the complaint. As noted above, Section 1983 claims against individual defendants require personal involvement in the allegedly improper conduct. Throughout their complaint, plaintiffs alleged that defendants Tiberi and Schoenle expressed disapproval of the GAP exhibit and the possibility that people would be forced to see it; attempted to move the GAP exhibit or to reduce its size; and explicitly told plaintiffs during the two days of the exhibit that they would not stop the counter-protesters. Again, plaintiffs will have to substantiate these allegations during discovery, but the allegations contain enough factual information to establish a plausible scenario in which the individual defendants played a direct role in the obstruction of the GAP exhibit.

**IV. CONCLUSION**

For all of the foregoing reasons, the Court respectfully recommends denying defendants' motion (Dkt. No. 11).

**V. OBJECTIONS**

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); FRCP 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

*/s Hugh B. Scott*
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: October 1, 2013